ORIGINAL
FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

MAR 22 2010

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| UNITED STATES OF AMERICA,  )  | |
| )  | No. ____10-CR-88-J____ |
| Plaintiff,  )  | |
| )  | 18 U.S.C. §§ 1341, 1343 and 1349 |
| v.  )  | (Conspiracy to Commit Mail and |
| )  | Wire Fraud) |
| BRETT MATHEW LATTIN,  )  | |
| )  | |
| Defendant.  )  | |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

Beginning on or about October 12, 2006, and continuing through on or about October 17, 2007, in the District of Wyoming and elsewhere, the defendant, **BRETT MATHEW LATTIN**, and Mark Allan McGregor did knowingly, intentionally and unlawfully combine, conspire, confederate and agree with each other to commit mail and wire fraud by devising and executing a scheme to defraud Marathon Oil Corporation by means of false and fraudulent pretenses, representations, promises, and omissions in violation of 18 U.S.C. §§ 1341, 1343 and 1349.

### DESCRIPTION OF THE OFFENSE

At all times relevant to this information, unless otherwise indicated:

1. The defendant, **BRETT MATHEW LATTIN** ("LATTIN") resided in Sheridan, Wyoming. From approximately August 1, 2006, until November 2, 2006, Lattin was employed by Production Services Network ("PSN"). Marathon Oil Company contracts with PSN to provide staff for operations and development in the field. Lattin was employed through PSN in the position of

Construction Supervisor. Between November 27, 2006, and October 4, 2007, Lattin was employed by Marathon in the position of Construction Supervisor in the Sheridan, Wyoming field office.

2. Mark Allan McGregor ("McGregor"), resided in Rock Springs and Sheridan, Wyoming. McGregor provides contract services for oil and gas exploration and production companies. He owns and operates Sweetwater Trucking, Inc. ("Sweetwater Trucking"), a corporation organized and existing under the laws of the State of Wyoming, with its principle place of business in Rock Springs, Wyoming. From at least November 3, 2006, through October 17, 2007, McGregor owned and operated M & L Services, LLC ("M&L Services"), a Limited Liability Company organized and existing under the laws of the State of Wyoming, with a principle place of business in Sheridan, Wyoming.

3. Marathon Oil Corporation ("Marathon") is a corporation organized and existing under the laws of the State of Delaware and headquartered in Houston, Texas. Marathon is a worldwide oil and gas exploration and production company, with field offices in Gillette and Sheridan, Wyoming.

4. Through its subsidiaries Marathon Oil Company and Pennaco Energy, Inc., Marathon produces coal bed methane ("CBM") gas from wells in the Powder River Basin located in northeastern Wyoming. A byproduct of extracting the CBM gas is water, which sometimes has a high sodium content and must be evaporated or used in a manner that prevents it from returning directly into the aquifer or to the surface water. Marathon used earthen reservoirs to contain water from the CBM gas production and slowly let it seep back into the ground and not resurface.

5. In approximately March of 2006, two of the reservoirs began to leak and the CBM water flooded the fields of a private landowner. Later, on May 9, 2006, the Wyoming Department of Environmental Quality ("DEQ") issued Marathon a written notice to remedy or correct the leaking reservoirs. By the Fall of 2006, Marathon decided to fix the leaking reservoirs and line the other reservoirs with bentonite to mitigate the leaking. As a PSN and Marathon employee, **LATTIN** was responsible for supervising the reservoir repair project. When he became a Marathon employee, **LATTIN** reviewed and approved invoices submitted by contractors for construction work done by Marathon's contractors. In his capacity as an employee, he owed a fiduciary duty to act in good faith and with due regard to the interests of Marathon.

## THE SCHEME TO DEFRAUD

6. On October 12, 2006, **LATTIN** submitted an employment application to Marathon which falsely stated he earned a degree in civil engineering from the Colorado State University with a 3.8 grade point average. By falsely stating in the application and interviews he earned a degree in civil engineering, **LATTIN** fraudulently represented himself to Marathon as a person qualified for the position of Construction Supervisor.

7. **LATTIN** then approached McGregor – who **LATTIN** had previously worked for as an employee of Sweetwater Trucking – about contracting with Marathon to repair the reservoirs in exchange for a kickback. McGregor agreed to pay **LATTIN** a $.05 per square foot kickback for securing a contract with Marathon to repair the reservoirs at $.65 per square foot. To conceal the fraudulent agreement, McGregor and **LATTIN** agreed McGregor would use M&L Services to

contract with Marathon and pay the kickbacks through his Sweetwater Trucking accounts in the name of a person known to the United States.

8. On November 17, 2006, **LATTIN** persuaded Marathon to bypass normal contracting procedures and enter – under a master service contract between with M & L Services and Marathon – a sole source job order for the repair of 7 reservoirs ("Job Order 1"). **LATTIN** did so by falsely representing M & L Services as the only company in the area with the specialized expertise and equipment necessary to repair the reservoirs when, in fact, he knew McGregor had never before performed the scope of work required to repair the reservoirs. Job Order 1's specifications required no less than eight pounds of bentonite per square foot tilled and blended into the top eight inches of the reservoirs' soil and no less than an inch of bentonite broadcast over the tilled and blended surface. By falsely stating bentonite was expected to increase in price in the coming year, **LATTIN** also secured for McGregor a contract price of $.65 per square foot and authorizing a maximum payment to McGregor of $1,466,506.

9. The contract required McGregor to notify Marathon's representative when work had been completed. After inspecting and testing the work, Marathon's representative could either accept the work or notify McGregor how the work fails to comply with the contract. If necessary, McGregor was allowed to make corrections. Once the work was accepted, McGregor was required to submit invoices containing sufficient detail to support the charges and contain the approval of Marathon's representative.

10. On November 27, 2006 – **LATTIN**'s first day as Marathon's Construction Supervisor and acting as its representative – McGregor submitted for payment, and **LATTIN** approved, two

4

invoices in the total amount of $190,668.99. The invoices falsely stated work had been performed meeting the contract's specifications to repair the first reservoir.

11. After **LATTIN** approved the invoices submitted by McGregor, the invoices were sent to Pennaco Energy, Inc., a Marathon subsidiary, in Tulsa, Oklahoma for processing. Pennaco would then notify Marathon's Governance/Expense Express Department in its office in Findlay, Ohio, to submit payment to M & L Services. The payments occurred one of two ways. In some instances, Governance/Expense Express would issue a check and mail it, via United States Postal Service, to M & L Services, in Rock Springs, Wyoming. In other instances, a wire transfer would occur from Marathon's bank account at National City Bank in Cleveland, Ohio, to M & L Services' bank account in either Rock Springs or Sheridan, Wyoming.

12. After the money was deposited or wired into the M & L Services bank account, McGregor would transfer the money to the Sweetwater Trucking bank account. McGregor would then pay **LATTIN**, by wire transfer or check, from Sweetwater Trucking, using the name and bank account of a person known to the United States.

13. Between November 29, 2006, and December 4, 2006, McGregor submitted for payment, and **LATTIN** approved, four invoices in the total amount of $554,142.55. The invoices falsely stated work had been performed meeting the contract's specifications to repair four of the reservoirs.

14. On December 8, 2006, **LATTIN** sought approval for a second sole source job order for McGregor to repair 15 additional reservoirs ("Job Order 2"). Job Order 2 was approved by

Marathon on December 19, 2006, under the same terms, conditions and specifications as Job Order 1, with a maximum authorized payment of $1,204,655.

15. On December 26, 2006, McGregor paid **LATTIN** a $105,000 kickback from a portion of the proceeds they obtained from Marathon through the scheme to defraud.

16. On January 9, 2007, McGregor submitted for payment, and **LATTIN** approved, two invoices in the total amount of $201,798.35. The invoices falsely stated work had been performed meeting the contract's specifications to repair two reservoirs under Job Order 1.

17. On January 22, 2007, McGregor submitted for payment, and **LATTIN** approved, 15 invoices in the total amount of $602,324.17. The invoices falsely stated work had been performed meeting the contract's specifications to repair 15 reservoirs under Job Order 2.

18. On February 15, 2007, McGregor paid **LATTIN** a $33,500 kickback from a portion of the proceeds they obtained from Marathon through the scheme to defraud.

19. On March 22, 2007, McGregor paid **LATTIN** a $138,000 kickback from a portion of the proceeds they obtained from Marathon through the scheme to defraud.

20. On April 2, 2007, McGregor submitted for payment, and **LATTIN** approved three invoices in the total amount of $214,500. The invoices falsely stated work had been performed meeting the contract's specifications to repair three reservoirs under Job Order 1.

21. On April 21, 2007, McGregor submitted for payment, and **LATTIN** approved, four invoices in the total amount of $133,250. The invoices falsely stated work had been performed meeting the contract's specifications to repair four reservoirs under Job Order 2.

22. On May 21, 2007, McGregor submitted for payment, and **LATTIN** approved, an invoice in the amount of $29,354. The invoice falsely stated work had been performed meeting the contract's specifications to repair a reservoir under Job Order 1.

23. On June 19, 2007, Marathon approved **LATTIN's** request to increase the limit of the overall monetary amount allowed for M & L Services to submit invoices for payment under a Recurring Service Order ("RSO"). McGregor and **LATTIN** fraudulently billed under the RSO the repair of 3 additional reservoirs. Also under the RSO, Marathon began paying M & L Services for road work done under **LATTIN**'s supervision and McGregor paid **LATTIN** a kickback from the money M & L Services received from Marathon for the road work.

24. Between June 29, 2007, and October 17, 2007, Marathon paid M & L Services approximately $2,600,000 for road work under the RSO.

25. On June 29, 2007, McGregor submitted for payment, and **LATTIN** approved, two invoices in the total amount of $73,287.18. The invoices falsely stated work had been performed meeting the contract's specifications to repair three reservoirs under Job Order 2.

26. In addition, on June 29, 2007, McGregor submitted for payment, and **LATTIN** approved, an invoice in the amount of $114,999.90 for the repair of 135,294 square feet of a reservoir under the RSO. The invoice falsely stated the reservoir had been repaired under the same specifications as Job Orders 1 and 2. McGregor and **LATTIN** also increased the price of bentonite in the invoice to $.85 per square foot, claiming again the price of bentonite was increasing.

27. On July 2, 2007, McGregor paid **LATTIN** a $65,000 kickback from a portion of the proceeds they obtained from Marathon through the scheme to defraud.

7

28.     On July 27, 2007, the DEQ sent a letter notifying Marathon that the same two reservoirs that leaked CBM water in March of 2006, were leaking again and CBM water was surfacing on the same fields of a private landowner. McGregor had been paid by Marathon for repairing the reservoirs under Job Order 1 when, in fact, the work had not been performed.

29.     As reservoirs began to leak that had already been invoiced and paid, McGregor purchased and received 148,000 square feet of Akwaseal bentonite mats for a total price of $78,444. McGregor and **LATTIN** used the bentonite mats because they could be installed quickly to stop the reservoirs from leaking -- masking the fact that the reservoirs had not been lined as required by Job Order #1.

30.     On August 14, 2007, an attorney with Marathon met with **LATTIN** after the company had received the letter from DEQ. During the meeting, **LATTIN** falsely claimed the reservoir work was performed beyond the required specifications and, in fact, falsely stated M & L Services had lined the reservoirs with 13 pounds of bentonite per square foot. **LATTIN** also falsely claimed he inspected the work and falsely claimed the work had been tested by a local engineering firm.

31.     On August 17, 2007, McGregor paid **LATTIN** a $60,000 kickback from a portion of the proceeds they obtained from Marathon through the scheme to defraud.

32.     On September 9, 2007, McGregor submitted for payment, and **LATTIN** approved, two invoices for the bentonite mats used in an attempt to stop a reservoir in Job Order 1 from leaking CBM water that had surfaced on the fields of a private landowner. The invoices were submitted under the RSO, charging Marathon at a rate of $2.00 per square foot in a total amount of $302,000.

33. On September 26, 2007, McGregor submitted for payment, and **LATTIN** approved, an invoice in the amount of $89,250 for the repair of 105,000 square feet of a reservoir under the RSO. The invoice falsely stated the reservoir had been repaired under the same specifications as Job Orders 1 and 2. McGregor and **LATTIN** also increased the price in the invoice to $.85 per square foot, claiming again the price of bentonite was increasing.

34. On September 26, 2007, McGregor submitted for payment, and **LATTIN** approved, an invoice in the amount of $97,750 for the repair of 115,000 square feet of a reservoir under the RSO. The invoice falsely stated the reservoir had been repaired under the same specifications as Job Orders 1 and 2. McGregor and **LATTIN** also increased the price in the invoice to $.85 per square foot, claiming again the price of bentonite was increasing.

35. On September 26, 2007, McGregor submitted for payment, and **LATTIN** approved, an invoice in the amount of $72,250 for the repair of 85,000 square feet of a reservoir under the RSO. The invoice falsely stated the reservoir had been repaired under the same specifications as Job Orders 1 and 2. McGregor and **LATTIN** also increased the price in the invoice to $.85 per square foot, claiming again the price of bentonite was increasing.

36. On September 26, 2007, McGregor submitted for payment, and **LATTIN** approved, an invoice in the amount of $89,250 for the repair of 105,000 square feet of a reservoir under the RSO. The invoice falsely stated the reservoir had been repaired under the same specifications as Job Orders 1 and 2. McGregor and **LATTIN** also increased the price in the invoice to $.85 per square foot, claiming again the price of bentonite was increasing.

37. On September 28, 2007, McGregor submitted for payment, and **LATTIN** approved, an invoice in the amount of $255,000 for the repair of 300,000 square feet of a reservoir under the RSO. The invoice falsely stated the reservoir had been repaired under the same specifications as Job Orders 1 and 2. McGregor and **LATTIN** also increased the price in the invoice to $.85 per square foot, claiming again the price of bentonite was increasing. Marathon held the payment of this invoice pending an audit of M & L Services.

38. On October 3, 2007, McGregor paid **LATTIN** kickbacks of $30,000 and $70,000 from a portion of the proceeds they obtained from Marathon through the scheme to defraud.

39. On October 4, 2007, **LATTIN**'s employment with Marathon was terminated. After **LATTIN** was terminated, McGregor submitted to Marathon additional invoices for payment in the total amount of $1,823,296.88. Some of the invoices were signed as approved by **LATTIN** after his employment with Marathon had been terminated.

40. On October 17, 2007, McGregor paid **LATTIN** a $100,000 kickback from a portion of the proceeds they obtained from Marathon through the scheme to defraud.

41. In total, the specifications of Job Orders 1 and 2, and the RSO's, required approximately 23,454 tons of granular bentonite be applied to the reservoirs; however, between November 2006 and October 2007, McGregor only purchased a total of 9,814.49 tons of granular bentonite.

42. On December 20, 2007, Marathon completed its investigation which revealed a small presence of bentonite in a few reservoirs. Most of the reservoirs, however, were never lined with any amount of bentonite. In fact, most of the 9814.49 tons of granular bentonite McGregor

purchased for Job Orders 1 and 2 and the RSO's, remained in several piles near the unrepaired reservoirs.

43. In total, Marathon paid McGregor approximately $5,001,921.51. From those proceeds, McGregor paid **LATTIN** kickbacks in the total amount of $601,500.

### THE MAILINGS

44. On or about the following dates and for the purpose of executing the above-described scheme, **LATTIN** and McGregor knowingly caused the following checks to be sent, delivered, and moved by the United States Postal Service:

| Date of Payment | Check Amount | Mailed From: | Mailed to: |
| --- | --- | --- | --- |
| 12/14/06 | $744,811.54 | Governance/Expense Express Marathon Oil Company, d/b/a Marathon Petroleum Company 539 S. Main Street Findlay, OH 45840 | M & L Services P.O. Box 1384 Rock Springs, WY 82901 |
| 1/24/07 | $201,798.35 | Governance/Expense Express Marathon Oil Company, d/b/a Marathon Petroleum Company 539 S. Main Street Findlay, OH 45840 | M & L Services P.O. Box 1384 Rock Springs, WY 82901 |
| 3/6/07 | $542,658.39 | Governance/Expense Express Marathon Oil Company, d/b/a Marathon Petroleum Company 539 S. Main Street Findlay, OH 45840 | M & L Services P.O. Box 1384 Rock Springs, WY 82901 |
| 3/23/07 | $59,665.78 | Governance/Expense Express Marathon Oil Company, d/b/a Marathon Petroleum Company 539 S. Main Street Findlay, OH 45840 | M & L Services P.O. Box 1384 Rock Springs, WY 82901 |

# THE WIRES

45. On or about the following dates and for the purpose of executing the above-described scheme, **LATTIN** and McGregor knowingly caused to be transmitted by wire in interstate commerce the following transfer of monies (or funds):

| Date of Wire | Wire Amount | Wired From: | Wired to: |
|---|---|---|---|
| 5/7/07 | $214,500.00 | Marathon Oil Company<br>National City Bank<br>Cleveland, Ohio | M & L Services<br>Sheridan State Bank<br>Account #523653<br>Sheridan, Wyoming |
| 5/17/07 | $133,250.00 | Marathon Oil Company<br>National City Bank<br>Cleveland, Ohio | M & L Services<br>Sheridan State Bank<br>Account #523653<br>Sheridan, Wyoming |
| 6/7/07 | $29,354.00 | Marathon Oil Company<br>National City Bank<br>Cleveland, Ohio | M & L Services<br>Sheridan State Bank<br>Account #523653<br>Sheridan, Wyoming |
| 7/3/07 | $493,489.20 | Marathon Oil Company<br>National City Bank<br>Cleveland, Ohio | M & L Services<br>Sheridan State Bank<br>Account #523653<br>Sheridan, Wyoming |
| 7/18/07 | $515,184.27 | Marathon Oil Company<br>National City Bank<br>Cleveland, Ohio | M & L Services<br>Sheridan State Bank<br>Account #523653<br>Sheridan, Wyoming |
| 8/13/07 | $671,946.31 | Marathon Oil Company<br>National City Bank<br>Cleveland, Ohio | M & L Services<br>Sheridan State Bank<br>Account #523653<br>Sheridan, Wyoming |

| Date of Wire | Wire Amount | Wired From: | Wired to: |
|---|---|---|---|
| 10/16/07 | $324,474.38 | Marathon Oil Company<br>National City Bank<br>Cleveland, Ohio | M & L Services<br>Sheridan State Bank<br>Account #523653<br>Sheridan, Wyoming |

All in violation of 18 U.S.C. § 1349.

CHRISTOPHER A. CROFTS
United States Attorney

By: _____
L. ROBERT MURRAY
Assistant United States Attorney

## PENALTY SUMMARY

**DATE:** March 22, 2010

**DEFENDANT NAME:** BRETT MATHEW LATTIN

**VICTIM:** NO

**OFFENSE AND PENALTIES:**

**OFFENSE:** 18 U.S.C. §§ 1341, 1343 and 1349
(Conspiracy to Commit Mail and Wire Fraud)

**PENALTIES:**

a) NMT 20 Years (18 U.S.C. §§ 1341 and 1343);

b) A Fine in an Amount Equal to the Greatest of (1) $250,000, (2) Twice the Gross Pecuniary Gain the Conspirators Derived from the Crime, Or, (3) Twice the Gross Pecuniary Loss Caused to the Victim of the Crime by the Conspirators (18 U.s.c. § 3571(b) and (d);

c) 3 Years Supervised Release;

d) Pursuant to 18 U.S.C. §§ 3663 and 3663a, the Court Is Required to Order the Defendant to Pay Restitution to the Victim of the Offense, in an Amount to Be Determined at the Time of Sentencing, Which Could Be as Much as $2,450,000; and

e) $100 Special Assessment

**AGENT:** Rich Fanelli/FBI
Chris Lucas/USPS

**AUSA:** L. Robert Murray

**ESTIMATED TIME OF TRIAL:**

✓ five days or less
___ over five days
___ other

**INTERPRETER NEEDED:**

___ Yes
✓ No

**THE GOVERNMENT:**

___ will

✓ will not

**SEEK DETENTION IN THIS CASE.**

___ The court should not grant bond because the defendant is not bondable because there are detainers from other jurisdictions